NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1653-14T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KONSTADIN BITZAS, a/k/a
CONSTANTINE BITZAS,
CHRISTOS BITZAS, and
DEAN BITZAS,

    Defendant-Appellant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **July 10, 2017** |
| **APPELLATE DIVISION** |

Argued September 28, 2016 — Decided  July 10, 2017

Before Judges Fuentes, Simonelli and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 14-02-0228.

Moses V. Rambarran argued the cause for appellant (Rambarran Law Firm, attorneys; Mr. Rambarran, of counsel and on the brief).

Anthony C. Talarico, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Gurbir S. Grewal, Acting Bergen County Prosecutor, attorney; Mr. Talarico, of counsel and on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

A Bergen County grand jury returned an indictment against defendant Konstadin Bitzas, a/k/a Dean Bitzas, charging him with second degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4a (count one); third degree terroristic threats, N.J.S.A. 2C:12-3b (count two); fourth degree aggravated assault by pointing a firearm at or in the direction of another, N.J.S.A. 2C:12-1b(4) (count three); fourth degree possession of a handgun following a conviction for possessing a controlled dangerous substance, N.J.S.A. 2C:39-7a (counts four through eight); second degree possession of an assault firearm, N.J.S.A. 2C:39-5f (count nine); and fourth degree possession of a large capacity magazine, N.J.S.A. 2C:39-3j (counts ten and eleven).

Before the trial began, the judge severed counts four through eight to allow the jury to decide the remaining counts without being influenced by defendant's prior drug-related convictions.[1] The State's first witness, P.K,[2] was a woman who previously had a dating relationship with defendant. She testified about the incident that gave rise to the first three counts of the indictment. P.K. continuously responded to defense counsel's

---

[1] A bifurcated trial is required to avoid the prejudice that would ensue if the jurors were previously aware that defendant had been convicted of one or more of the predicate offenses listed in N.J.S.A. 2C:39-7a; see State v. Ragland, 105 N.J. 189, 193 (1986).

[2] Although the indictment identifies the complaining witness by her complete name, we use only her initials to protect her privacy.

questions in a disruptive manner. She disregarded the prosecutor's instructions, deliberately mentioned extraneous information that was prejudicial to defendant, and walked out of the courtroom during her cross-examination on the first day of trial.

Although the trial judge issued curative instructions to the jury, P.K.'s obstreperous behavior eventually overwhelmed the proceedings. It soon became clear that the curative instructions could neither counteract the prejudice caused by the witness's misbehavior nor deter her from continuing to disrupt the trial. As a sanction for P.K.'s refusal to adhere to the prosecutor and the court's repeated instructions, the trial judge sua sponte dismissed the first three counts of the indictment[3] "with prejudice." The judge did not consult with the attorneys before taking such an extraordinary action. More importantly, the judge did not identify any legal authority that permits a judge in a criminal trial to unilaterally dismiss a criminal charge "with prejudice" as a sanction for the misconduct of the State's fact witness, or to enter the functional equivalent of a judgment of acquittal before the State has completed presenting its case in chief.

---

[3] The three counts the judge dismissed charged defendant with second degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4a; third degree terroristic threats, N.J.S.A. 2C:12-3b; and fourth degree aggravated assault, N.J.S.A. 2C:12-1b(4).

The judge overruled the State's objection challenging her authority to take this action and denied the State's motion to declare a mistrial. Defense counsel acquiesced to the trial judge's decisions without comment. The State's case then continued with the indictment's remaining counts, which were part of the first phase of a bifurcated trial. The State called a law enforcement witness who testified about the execution of a search warrant on defendant's residence, the seizure of defendant's firearms, and the operability of defendant's weapons.

The jury found defendant guilty on the three counts of the indictment that charged him with second degree possession of an assault firearm, N.J.S.A. 2C:39-5f; and fourth degree possession of a large capacity magazine, N.J.S.A. 2C:39-3j. The same jury later reconvened in the second phase of the bifurcated trial and convicted defendant on five counts of fourth degree possession of a handgun following a conviction for possessing a controlled dangerous substance, N.J.S.A. 2C:39-7a. The trial court sentenced defendant to an aggregate term of thirteen years, with eight years of parole ineligibility.

In this appeal, both sides have framed their arguments in a manner that repudiates the positions they advanced before the trial court. Defendant now argues the trial judge abused her discretion in allowing the jury to render a verdict on the

remaining counts in the indictment after she dismissed with prejudice the first three counts that involved P.K. as the complaining witness. Defendant claims the judge should have interviewed each juror individually to determine whether any of them had a negative impression of defendant based on P.K.'s extensive testimony portraying him as a "bad person in general." Defendant also argues the judge's curative instructions were insufficient to counteract the prejudice caused by P.K.'s testimony.

The State similarly abandons the position it adopted before the trial court. In a letter in lieu of a formal brief submitted pursuant to Rule 2:6-2(b), the State now argues the trial judge did not abuse her discretion in denying its motion for a mistrial because defendant was not prejudiced "and the jury was given a sufficient curative instruction."

Despite the sophistry of the parties' positions, our duty as appellate jurists is to determine whether the magnitude of the trial judge's error is clearly capable of producing an unjust result. R. 2:10-2. We are satisfied the trial judge's decision cannot stand as a matter of law. The testimony of the State's complaining witness is replete with extraneous, highly prejudicial comments about defendant's propensity for violence and alleged use of illicit drugs. After carefully reviewing the record, we are

satisfied the trial judge's initial response to the witness's improper commentary was insufficient to counteract its prejudicial effect.

The trial judge has the ultimate responsibility to manage a trial. When presiding, the judge must impress upon all of the trial's participants that they are expected to behave in a manner that promotes decorum and solemnity. Although a trial is an inherently adversarial proceeding, the attorneys' zeal is circumscribed by the Rules of Professional Conduct and their role as officers of the court. Witnesses, especially those who have been victims of a crime, are understandably emotionally invested in the outcome of the proceedings. It is therefore particularly important for judges to: (1) set clear guidelines on how witnesses should respond to a lawyer's questions; and (2) establish and enforce the boundaries of appropriate behavior. Here, the trial judge erred when she delegated these responsibilities to the prosecutor.

We also hold the trial judge erred when she denied the State's motion to declare a mistrial after it became apparent that the witness's misconduct had irreparably tainted defendant's right to a fair trial. The judge's decision to dismiss the indictment's first three counts was ineffective in counteracting the prejudice caused by the witness's misconduct. More importantly, a Superior

6

Court judge presiding in a criminal trial has no authority to sua sponte dismiss a count in an indictment as a sanction for a lay witness's misconduct before the State has completed presenting its case in chief.

I

The First Day of Trial

On the first day of trial, the State called P.K. as its first witness. She testified she had "a dating relationship" with defendant that began in August 2012 and ended in a violent confrontation on August 31, 2013. During this period, P.K. saw defendant "on and off" and slept at his house occasionally. In response to the prosecutor's questions, P.K. claimed defendant bragged to his friends about having firearms in the house. She testified defendant even pulled a machine gun out of his mattress and said, "'Look what I got.'"

According to P.K., the event that gave rise to the first three counts of the indictment occurred on August 31, 2013. She arrived at defendant's house at approximately 10 p.m. P.K. testified the following occurred that night:

> PROSECUTOR: [T]ell us what happened when you got to the defendant's house that night[.]
>
> WITNESS: When I got to his house[,] he let me in through the back, I believe, and he had something -- he let out a big puff of smoke and I got into an argument with him. He grabbed my arm. He started hitting me so I

tried to call the police. He pulled my phone
out. He broke my phone in half, threw it
against the dishes, started beating me up,
then went into his drawer, the same drawer
that he pulled out the gun from last time. I
saw him turning to me --

DEFENSE COUNSEL: Objection.

THE COURT: What's your objection?

DEFENSE COUNSEL: She's talking about something
that happened last time.

WITNESS: <u>No, I am not, sir</u>.

DEFENSE COUNSEL: Judge, we went over this
numerous times.

THE COURT: The objection is overruled but the
way I understood the testimony was about
August 31, 2013, correct?

PROSECUTOR: Yes.

[(Emphasis added).]

Although the judge overruled defense counsel's objection, the

first language we highlighted exemplifies the conduct that later

permeated P.K.'s testimony during cross-examination. Although

seemingly innocuous, her comment that defendant "let out a big

puff of smoke" is actually incendiary. As the trial judge later

explained, P.K.'s references to "smoke" were accompanied by a

"snorting" pantomime on the witness stand. Taken together, the

judge concluded that P.K. wanted the jury to view defendant as a

user of illicit drugs.

8                                                    A-1653-14T1

The second highlighted portion reveals P.K.'s disruptive tendencies while on the witness stand. As the record shows, P.K. impulsively inserted herself into the colloquy between the judge and defense counsel and personally refuted defense counsel's objection by addressing him directly. These two elements of P.K.'s temperament became the hallmark of her obstreperous demeanor, which escalated out of control during defense counsel's cross-examination.

When the prosecutor resumed her direct examination, she asked P.K. to continue describing what occurred on the night of August 31, 2013. According to P.K., although defendant had broken her cellphone, she was able to call the police using the home's landline telephone. P.K. testified that when defendant discovered she had called the police, he said: "I will fucking kill you. I swear to God I will fucking kill you. I swear I will kill you for this if you say anything." P.K. testified that when the police arrived, she was "scared" and "didn't say one word." When asked why she was scared, P.K. responded: "I was scared because of the guns, because he beat me[,] and [because] he told me that he's going to kill me."

After the police officers arrived, P.K. was transported to a nearby hospital for a head injury that caused lumps. She had visible bruises and abrasions "all over her body." The prosecutor

showed P.K. a series of photographs taken the following day, September 1, 2013, which purportedly depicted the injuries she sustained to various parts of her body. P.K. also identified two photographs that she claimed depicted her cellphone, which defendant allegedly "broke . . . in half." A third photograph depicted the wall-mounted landline telephone she used to call the police. The last photograph depicted what P.K described as the "machine gun under [defendant's] bed."[4] Except for the excerpt highlighted above, P.K. completed her testimony on direct examination without incident.

P.K.'s disruptive behavior reached a critical point during defense counsel's cross-examination. The first incident occurred when defense counsel questioned P.K. about her trip to Greece to visit defendant's parents in 2012. The following exchange illustrates the problem:

> DEFENSE COUNSEL: How long were you in Greece[?]
>
> . . . .
>
> A. Two weeks. Unbearable weeks. Unbearable. Isolation. One hundred ten degrees. No one, no one else there. Wouldn't talk to me. Spent the whole time ignoring me. It was lovely traveling with him.
>
> DEFENSE COUNSEL: Lovely traveling? When you came back you decided the trip was over?

---

[4] Although these photographs were admitted into evidence and published to the jury, they are not part of the appellate record.

A. Then he got back with his girlfriend he was with for the whole time I was with him. Her name was [N.M.]. They smoked crack together. That's why he had a problem with our relationship.

DEFENSE COUNSEL: Judge --

THE COURT: I have to talk to the attorneys.

(Sidebar with reporter)

THE COURT: [Prosecutor], did you not inform your victim she can't talk about any prior bad acts of the defendant?

PROSECUTOR: I did. He's asking the questions.

THE COURT: You're going to have to talk to her. She should know this. This is like I have to give a limiting instruction.

PROSECUTOR: All right. Perhaps . . . we can break and I can reinforce that. It's 12:30 [p.m.] I can reinforce that.

THE COURT: I want to continue with the case.

DEFENSE COUNSEL: I have to see my son before he goes away for [thirty] days. I don't mind skipping lunch.

THE COURT: We'll continue. I'll give a limiting instruction.

(Sidebar concluded)

[What occurs next is in the presence of the jury.]

THE COURT: [P.K.], can you step outside for a moment[?]

Prosecutor, if you could step outside with her. I just want to give the limiting instruction, [Prosecutor]. Could you step

11                                          A-1653-14T1

outside with her[?] . . . I want to give the instructions to the jurors. We'll call her back in when we're ready.

PROSECUTOR: All right.

. . . .

THE COURT: [Addressing the jury]

You heard testimony with regards to some other prior bad activity involving the defendant. I believe the statement . . . was he was using crack cocaine with some other individual by the name of [N.M.]. There's absolutely no evidence of that at all. You're to disregard that completely as though you never heard it. . . . [Y]ou are not at any point in time to inject that in any way into your deliberations. It's as though it never happened. You are to completely disregard it because there's absolutely no evidence of that whatsoever.

At this point, the record shows P.K. returned to the courtroom, took the witness stand, and resumed with her testimony on cross-examination. Soon thereafter, P.K. testified that she slept at defendant's house after she returned from Greece "because he wouldn't let me leave and go home." Defense counsel stated: "I've known Mr. Bitzas . . . twenty-eight years." Defense counsel's statement prompted an immediate objection from the prosecutor. After sustaining the objection, the judge made the following comments in the jury's presence, which resulted in the following exchange:

THE COURT: Absolutely. [Defense counsel], you're either going to be the attorney or

12

you're going to be the witness. Which is it going to be? Tell me right now before we continue with this trial. You know what the court rules are. You cannot testify on behalf of anyone.

DEFENSE COUNSEL: I'm trying to get the truth. I'm getting less than the truth.

THE COURT: [Defense counsel], I'll see you at sidebar.

[The following colloquy occurred at sidebar.]

THE COURT: What is the circus that's going on in this courtroom? You know that you are not supposed to talk about your personal feelings about the defendant, about whether or not you like him, whether or not he's your good friend for twenty-eight years. If I hear any more about a personal relationship that you have with the defendant you're going to get sanctioned and I'm going to have to declare a mistrial.

. . . .

DEFENSE COUNSEL: I didn't do it on purpose.

THE COURT: The same thing with the Prosecutor. When you have a domestic violence case[,] the first thing that you have to do is . . . tell the witnesses you can't talk to them about all the bad things that ever happened with regards to crimes. That's another egregious violation.

PROSECUTOR: I have instructed.

THE COURT: This is like a circus in this courtroom.

PROSECUTOR: I have instructed her. She even -- when we got to the courtroom she said, "But it happened."

13

I said to her, "It doesn't matter. You're not allowed to talk about [that]." She said, "Okay, okay." I've instructed her.

THE COURT: <u>If she does it again the case is over. It's going to be a dismissal with prejudice if she does it again. Now she's been warned</u>.

PROSECUTOR: I cautioned her.

THE COURT: Like a circus on both sides.

(Sidebar conference concluded.)

[(Emphasis added).]

Defense counsel resumed his cross-examination by asking P.K. to describe the events that preceded the confrontation in defendant's residence on August 31, 2013. According to P.K., she first met defendant that night at a joint restaurant and bar. She told defendant she was hungry and wanted to eat before consuming any alcoholic beverages. P.K. testified that defendant had finished eating by the time she arrived and ignored her many requests to get something to eat. She nevertheless consumed several alcoholic drinks and soon noticed she was "not sober." Although she asked defendant to drive her home or tow her car,[5] he left the club without helping her.

---

[5] P.K. testified defendant owned and operated a towing service company.

P.K. eventually drove to defendant's residence. Defense counsel asked P.K. what happened when she arrived. P.K. responded as follows:

> I walked in and he was holding some glass thing in his hand. He lets out a big puff of smoke. His eyes got like this. He started drooling. And I said this is where you went? This is why I got stuck there? This why? [sic] This is all why?
>
> I held the phone up. He went like this. He started grabbing me, hitting me. Cracked my phone. I said stop hitting me. Enough. Enough. Every time. No. I'm not putting up with it anymore.
>
> And this time he knocked me down. I tried -- He took my phone out of my hand, cracked it in half, threw it against the dishes. The garbage is right next to the dishes.

We pause to note that defense counsel did not object to P.K.'s clear references to defendant's illicit drug use; nor did the trial judge take any measures to dissuade the witness from continuing to disregard the boundaries of acceptable testimony.

Counsel's use of open-ended questions on cross-examination also allowed P.K. to frame her responses in an erratic fashion, aimlessly wandering without direction. This approach permitted P.K. to continue to respond in a manner that exacerbated the "circus" atmosphere the judge sought to avoid. The following exchange illustrates the point:

> DEFENSE COUNSEL: July 18, 2012. You're still dating Mr. Bitzas?

A. I don't know when that was.  Can you give me some context[] clues?

DEFENSE COUNSEL: Couple [of] days after you started to date him.  A couple [of] days after you started to date him [when] you said he wasn't normal and he had a black eye[;] two days later you're still dating him?

A. Yeah.  That seemed like the day that he brought all the people over when he showed the machine gun, yes.

DEFENSE COUNSEL: Judge, this is ridiculous.

A. <u>Actually you're right</u>.

DEFENSE COUNSEL: It's improper testimony.

THE COURT: The objection is overruled.  She answered your question.  You wanted to know what happened two days later.  She says that's the time --

DEFENSE COUNSEL: I asked specifically were you dating two days later.

THE COURT: She answered that question.  Move on to your next question.

[(Emphasis added).]

Once again, the record shows P.K. addressing defense counsel directly as counsel interacts with the trial judge on a point of procedure.  This combative interaction between defense counsel and P.K. continued unabated.  Throughout her cross-examination, P.K. continued to mention defendant's alleged "crack" use with a woman she identified as defendant's girlfriend.  At one point, P.K. even

attempted to interact with a person seated in the section of the courtroom reserved for the public.

> THE WITNESS: She could have called the police. And he said he's in Pennsylvania. He lied. He was in a hotel room with [N.M.] smoking crack in Fort Lee with my keys. I wanted to know where they were. That's the only time I saw her. I couldn't ask her for a tampon. I asked her for keys to get in my house. She wouldn't give me --

> THE COURT: You have to wait until the next question. What's your next question[?]

> DEFENSE COUNSEL: Why does she have a key to your apartment?

> THE WITNESS: Who?

> DEFENSE COUNSEL: You said you had to wait for her, pointing to someone in the audience.

P.K. did not identify who she pointed to, but that person was seated somewhere in the public section of the courtroom. From this point forward, P.K.'s combative conduct against defense counsel quickly degenerated into outright refusal to answer his questions.

> DEFENSE COUNSEL: Where does your other family live?

> A. I'm not telling you anything about my family. I don't want him to know anything about my family. He's a dangerous person. No way. No way.

> DEFENSE COUNSEL: [Judge,] [a]sk her to control these outbursts.

17

A. I'm not revealing any information about my family to this criminal with guns.

DEFENSE COUNSEL:  Judge, this is completely improper.

A. That's completely improper your question [sic].

THE COURT: [P.K.], you have to calm down.  You have to wait for the question and respond to the question.  Any other information [sic] respond to the question.

All right, [defense counsel].

DEFENSE COUNSEL: How far was your family's house?

A.  None of your business, sir.  I'm not letting you know where my family is so he can kill them with his guns. No, no.  Sorry.  He's already threatened my life.  He's already done things to them.  No way.  You can ask me that after he threatened to kill me?  Are you serious?

DEFENSE COUNSEL: You want to talk at sidebar?

THE COURT:  No.  Answer the question.  How long does it take you to go from one location to your family's house?  Don't give an address.

A. My location to my family's house?

THE COURT: Yes.  How many minutes?

A. Which family member are you talking about?

THE COURT: The one that you said you went to when you could not get into your house and you didn't want to pay for a locksmith overtime.

A. I don't know.  I can't answer that.  I don't know where I got the key that night.  I

18

don't remember what happened.  That's none of anybody's business.

. . . .

DEFENSE COUNSEL: Who is there [at your family's house]?

A. Somebody in my family.  None of your business, sir.  None of your business, sir.  Please don't ask me any question[s] about my family.  I don't want him having anything to do with my family.  This is my mistake that I went out with this piece of garbage and I don't think that they should suffer or be involved in any way.

Following several failed attempts to get P.K. to respond, the trial judge directed defense counsel to "[a]sk another question on another topic."  When counsel asked P.K. if her family lives in Fort Lee, P.K. responded:  "None of your business.  Let me go.  I need to take a break, please."  At this point, the transcript merely states: "Witness leaves courtroom."  Although it was not yet near the end of the court-day, the trial judge advised the jurors that the trial would not resume because one of the attorneys "has something I excused him for.  They're going to attend to that other case."  The trial resumed the following day.

II

The Second Day of Trial

The second day of P.K.'s testimony began with the prosecutor assuming a more aggressive, proactive role in objecting to questions that he thought were designed to revisit areas covered

19

on the previous day.  However, the record shows defense counsel's questions sought only to obtain responsive answers to the questions P.K. previously refused to answer.  The trial judge was sympathetic to the State's approach.  After sustaining the prosecutor's objections, the judge addressed defense counsel directly as follows:

> THE COURT: Move on to another topic.  Whatever topic it may be but it has to be a different topic.  I think yesterday you explored it at length.  She's explained it again today that she got a spare key.  She then . . . got into her apartment that night.  I think that's been now settled, that whole entire issue.
>
> WITNESS: Thank you, your Honor.

The cross-examination proceeded relatively uneventfully from this point forward.  Defense counsel established that P.K. agreed to travel to Greece with defendant after having known him for approximately one month.  Although she had kind words for defendant's parents, who resided in Greece at the time, P.K. described the trip as extremely unpleasant.  Defense counsel also questioned P.K. about the nature of her and defendant's activities as a couple.  The next point of contention occurred when defense counsel sought to explore P.K.'s testimony concerning her seeing defendant in Florida.

> DEFENSE COUNSEL: You testified you met him in Florida?

A. I was in Florida and he was following me around over there.

DEFENSE COUNSEL: He was following you in Florida?

A. Yes, he was.

DEFENSE COUNSEL: Who were you with in Florida?

A. I don't know. He said he was in a hotel room [or] something. But they tried to separate us. His friend and the friend's sister separated us so that he couldn't come near me because they said he was bad news and he just got out of jail. That's exactly what happened.

DEFENSE COUNSEL: Judge, this is completely improper testimony.

A. That was exactly what happened. That's why.

THE COURT: There's an objection.

Jurors, I'm going to instruct you again this trial is specifically about an incident that happened in August of 2013.

[Defense counsel], you're asking her questions about something when she was eighteen, nineteen years old. You're opening the door. You're stepping right into it.

I'm going to inform the jurors that last bit of testimony you just heard, that she believed that she heard something with regards to him being in jail, that that be completely stricken from the record. You're not to consider that in any way. It's hearsay.

Remember what I explained to you about hearsay. What other people say most of the time is inaccurate. Like playing telephone. By the time it gets to another person it's an

21

out-of-court statement. It's completely not relevant, is not credible testimony in any way. It's as though it never was said in court.

[Defense counsel], I'm going to remind you again you should probably continue with your cross examination as it relates to this case[,] but you're opening the door to all these other things that are not relevant.

Immediately following the judge's rebuke of the manner in which he questioned P.K., defense counsel asked P.K.: "Did you hook up with him when you were in Florida?" This prompted an immediate objection from the prosecutor. The judge sustained the objection and again criticized defense counsel in the presence of the jury. The judge admonished that "what somebody did when they were eighteen[,] if it's even true[,]" is not relevant to the case. Defense counsel responded by acknowledging he was not aware the Florida trip occurred when P.K. was eighteen years old.

From this point forward, the matter proceeded in the same disorderly fashion. The judge continued to disparage and criticize defense counsel in the jury's presence; P.K. continued to defy the decorum expected from a witness in a criminal trial by answering defense counsel's questions with nonresponsive, extraneous matters intended to cast defendant as a dangerous and violent man who used illicit drugs on a regular basis. For example, when defense counsel asked P.K. if defendant ever met her parents, she responded: "No way. My family would never want to meet him.

Never.  They would never let him near me or their house.  No way.

No way."  When defense counsel followed up to clarify, P.K.

admitted that defendant had met her mother, but not her "mother

and father." When defense counsel remarked "[V]ery clever," P.K.

made the following unsolicited statement:

> THE WITNESS: Can you not mention my handicapped mother?  I don't want him near her.  He entered her house.  It's a very sensitive area.  If he comes near her -- she was getting crank calls from him.  I don't want to stray off the subject.  However, I don't want him involved in her life.

In reacting to this event, the trial judge failed to correct

the witness's improper, unsolicited comments, but again

reprimanded defense counsel in the jury's presence.

> THE COURT:  You asked the question.  I keep on telling you.  You keep on going on all these other topics and then you don't like the answer.
>
> DEFENSE COUNSEL: Actually the answers are not responsive.
>
> THE COURT: They're responsive.  You're asking if he met the mother and father.
>
> DEFENSE COUNSEL: I had no idea the mother had a handicap.  This is the first I'm hearing of it.
>
> PROSECUTOR:  Your Honor, again we're going to get some testimony from counsel . . . as to what he knew and what he didn't know.
>
> DEFENSE COUNSEL: I didn't know any of this.

23

THE WITNESS: She had a stroke. She's in a wheelchair. Please leave her alone. She doesn't need his trauma that we had from him or enough [sic]. I don't want to bring her up. Would you mind please? Out of respect please. And understanding about the experiences that I've been through, please understand. Keep that in mind. That's all I'm asking.

DEFENSE COUNSEL: All I wanted to know is . . . did he ever meet your mother. That was a yes or no question.

A. He followed me to my house one day. He entered her house. I was having a private conversation with her. He said, "I locked your keys in your house [P.K.]." He entered her house, opened it without --

DEFENSE COUNSEL: Yes or no.

A. Yes, he opened it and trespassed without anybody inviting him.

DEFENSE COUNSEL: There's no control here.

THE COURT: Wait until he asks the question and answer the question.

Go ahead. Ask your next question.

THE WITNESS: Next question please.

DEFENSE COUNSEL: Is it fair to say your mother is a neighbor?

A. Listen, can you please get off my mother please. I'm begging you. I really am in fear for my life and her life because of him. Please. You're asking me where she lives now?

DEFENSE COUNSEL: I ask for an instruction about this.

A-1653-14T1

> PROSECUTOR: Objection again for these editorial comments by counsel, your Honor. It's not appropriate for this trial.

This chaotic scene continued in the jury's presence, while the judge and counsel discussed their respective recollections of what P.K. had said about her family during her testimony on the previous day. Finally, the judge again admonished defense counsel to remain focused on the event identified in the indictment.

> THE COURT: [Defense counsel], I'm going to direct you to ask questions about the incident. [The] August 31, [2013] incident. I've given you more than enough leeway to explore all different topics on cross-examination[,] but we [have to] concentrate on this indictment.
>
> DEFENSE COUNSEL: Excellent.
>
> THE COURT: Make sure that you discuss it with your client[,] but every question from now on better be with regards to that indictment.
>
> DEFENSE COUNSEL: Judge, Mr. Bitzas needs to use the bathroom.
>
> THE COURT: He can wait. He's a big boy.[6]
>
> DEFENSE COUNSEL: He has diabetes.
>
> THE COURT: Have a seat. Go ahead.

---

[6] We have included this remark by the trial judge because it displays insensitivity and a lack of judicial decorum. Although levity is not always inappropriate in a courtroom, this remark is facially offensive because it gratuitously demeans defendant based on his gender, shows insensitivity to a basic human need, and ignores a potentially serious health issue.

Defense counsel resumed the contentious cross-examination, trying to remain focused on the incident that occurred on August 31, 2013. P.K. remained combative and undeterred. She claimed defendant consistently lied to her about the nature of their relationship and continued his involvement with N.M. while dating her. When defense counsel characterized her relationship with defendant as akin to "living in a fictitious world," P.K. responded: "Everything I'm finding is like illegal, messages, drugs, everything." Defense counsel did not object.

The matter finally reached a critical point of no return when defense counsel questioned P.K. about what occurred in defendant's house on August 31, 2013. When defense counsel asked P.K. if defendant was "attentive" to her, she responded: "He was attentive to his drugs." This prompted defense counsel to turn to the trial judge and say: "This is ridiculous." At the prosecutor's request, the parties approached the judge at sidebar to discuss the matter. Once outside the jury's presence, the prosecutor stated for the first time that defendant was also facing a disorderly persons charge for possessing drug paraphernalia; this charge was being tried simultaneously by the trial judge as a municipal court. The prosecutor argued the judge could use P.K.'s testimony to support the factual findings the court would need to make with regard to this charge.

26

The judge rejected the prosecutor's argument as an improper attempt to justify P.K.'s repeated references to defendant's illicit drug use. The judge noted that evidence of drug paraphernalia should be presented through the testimony of police witnesses. The prosecutor ultimately agreed and abandoned this argument. The judge then returned to P.K.'s repeated violations of the strict limits she was required to follow with respect to her testimony. The prosecutor assured the judge that she had instructed P.K. accordingly. The judge excused the jurors to address the problems associated with P.K.'s testimony and to address P.K. directly:

> THE COURT: There's been an objection from the defense about the fact the victim, [P.K.], once again has talked about the defendant using drugs[.]
>
> . . . .
>
> I gave [the prosecutor] significant time to go outside. She assured me she had spoken to [P.K.], that she understands now. It was inadvertent. She actually had advised you during the preparation for the trial that you could not discuss the drug activity. And then she reminded you of it again because we had a violation in court. And that is just not allowed pursuant to the rules of evidence. Although it happened, although you may have observed it[,] the rules of evidence do not allow for you to talk about drug activity in a case such as this because he's not charged with possession of cocaine or possession of any drug for that matter.

27

[The prosecutor] explained to me, assured me that she had spoken to you, [P.K.], and that it would not happen again.

Yesterday we finished the trial early because [P.K.] . . . requested a break and I allowed her to take that break so she could compose herself. She appear[ed] to be very upset. I thought it best rather than continue for another hour until 2:30 [p.m.] we would go for the day.

Today there has been eight violations of that court order.

I have her, I counted them, eight times the victim today has mentioned either smoke, she's been snorting on the witness stand, mimicking what the defendant was doing which in no uncertain terms is snorting cocaine or something with a glass pipe. She did it at least three or four times.

There [were] an additional three . . . mention[s] of drug activity even before the August 31, 2013 incident and then the last one was the one we just heard where she said oh, he's more concerned about his drugs. That's what he was concerned about.

There's too many violations. I tried to cure the problem with the jurors by giving them an instruction to disregard it[,] but I cannot do it anymore with eight violations.

I'm going to dismiss this half of the trial. This part of the trial is dismissed with prejudice.

．．．．

It's only with regards to the counts involving [P.K.].

．．．．

28

> That would be count one, [second degree] possession of [a] weapon for [an] unlawful purpose. It would be count two, which is the . . . [third degree] terroristic threats. And it would be count three, which is [fourth degree] pointing of a firearm. The other counts, however, are going to remain because those other counts have nothing to do with [P.K.].

[(Emphasis added).]

At first, the prosecutor objected to the judge's sua sponte decision, arguing the curative instructions were sufficient to counteract any prejudice. The State also took the position that there was "nothing improper" about the witness's comments that she saw defendant blowing "a puff of smoke." The prosecutor maintained the statement was ambiguous and permitted the jury to infer defendant was smoking a cigarette. Finally, the prosecutor again argued this evidence was relevant to the disorderly persons offense, which the judge would need to decide as the trier of fact.

The judge rejected these arguments and clarified that when P.K. testified about seeing defendant blow a puff of smoke, she "used her hands to explain it to the jurors" and "started snorting." The judge specifically found that from the "way [P.K.] presented her hands, it's clear as though someone was using some type of glass thing." The judge ruled P.K.'s testimony in this regard was improper for the same reasons "you can't bring out the

previous conviction."  The judge also emphasized that these were not isolated mishaps by a nervous witness.  "She's clearly let[ting] the jurors know about the fact that the drug activity is not just a one[-]time incident."  Based on this record, the judge found that giving the jury further curative instructions would be futile.  In the judge's own words, "It's now too prejudicial."

The judge then addressed P.K. directly as follows:

> I wanted [P.K.] to be here to hear it.  I didn't want someone else explaining it to her. I wanted you to hear from me . . . the reasons the case is being dismissed.
>
> Perhaps you're very upset and for that reason you weren't able to follow the instructions of the [c]ourt but I tried.  Eight times I let it go.  I can't let it go after eight times. I wanted you to hear it from me.  You're excused.

The judge advised defense counsel to inquire as to whether defendant was willing to consider reopening plea negotiations based on the court's decision to dismiss the first three counts of the indictment with prejudice.  The prosecutor made clear that the State was not willing to modify its previous plea offer based on these events.  At this point, the court recessed for lunch. At the start of the afternoon session, but outside the jury's presence, the prosecutor addressed the trial judge as follows:

> PROSECUTOR:  Your Honor, I did go and meet with members of my office.

30

I just would like to state that the State is not sure and not in agreement that the [c]ourt has the authority to dismiss those counts before the end of the State's case.

. . . .

THE COURT: <u>It has nothing to do with the end of the State's case.  It's a mistrial and dismissal with prejudice for failure to follow the court order</u>.

PROSECUTOR: I understand.

THE COURT: It has nothing to do with the strengths of the [State's] proofs[,] which is a different standard.

PROSECUTOR: I understand.  However, and I'm accepting your Honor's decision, but . . . the reasons for the dismissal with prejudice were because of . . . undue prejudice to this jury.

. . . .

However, proceeding with this jury in light of your Honor's decision is not the proper remedy.  And the reason for that, if I may say, if down the line this defendant is convicted after this trial and raises the conviction on appeal, one of his claims would be that this jury, because of your Honor's decision that there was undue prejudice, he will raise that claim that this jury was prejudiced.

Now, the State will not have a claim at that point because your Honor has made that decision.  <u>We're asking for a mistrial[;] dismiss this jury and let's start anew, get a trial date with the remaining counts, certain persons and the possession of an assault weapon</u>.

[(Emphasis added).]

31                                    A-1653-14T1

The judge denied the State's motion for a mistrial.  The judge ruled that she was going to instruct the jury that the three dismissed counts in the indictment "were dismissed pursuant to a legal ruling" and that they had "nothing to do with the State [or] the defense."  Defense counsel did not participate in this matter.  When the jury returned to the courtroom to start the afternoon session, the judge apprised the jurors as follows:

> With regards to the indictment, if you recall[,] . . . there were six counts. Because of legal reasons, and the State has not been involved in this and neither has the defense, but I as the Judge for a legal reason have dismissed counts one, two[,] and three.

> We're going to proceed with the remainder of the case[,] which is the possession of the assault firearm, which is count nine, and the other two counts, five and six, [which] were possession of the large capacity ammunition magazine.  So there's three counts.  So when you deliberate you are not to consider any of the testimony that you've heard up until now. It will be stricken and you're not to consider it in any way in your deliberations.  You can only consider the testimony that is going to start from this point forward because the testimony that's going to begin from this point forward has to do with those counts, the ammunition, [the] large capacity magazine[,] and the assault firearm.

> Call your next witness.

The State's next and only witness was Fort Lee Detective Matthew Traiger.  During his testimony, Traiger described the firearms seized from defendant's residence pursuant to a search

A-1653-14T1

warrant on September 1, 2013. Traiger testified that when he began his shift that day, he was ordered to respond to defendant's residence to relieve an officer who was previously assigned to conduct "surveillance on the home in an unmarked vehicle." Traiger's shift began at 4 p.m. He arrived at defendant's residence to relieve the other officer approximately thirty minutes later.

Although the jurors were instructed to disregard everything they had heard over the past two days, Detective Traiger testified that the purpose of conducting surveillance on defendant's home "was a pending arrest and search warrant for a party in the premises." When asked to identify "the party" in question, Traiger responded: "Dean Bitzas." Traiger then pointed to defendant and identified him as the person he arrested that day after finding a Norinco SKS assault firearm and two large capacity ammunition magazines in his residence. The State rested at the conclusion of Detective Traiger's testimony.

III

Against this record, defendant raises the following arguments on appeal:

> POINT I
>
> IT WAS AN ABUSE OF DISCRETION TO CONTINUE WITH THE SAME JURY AFTER THE DISMISSAL OF THE DOMESTIC VIOLENCE COUNTS DUE TO COMPLAINANT/VICTIM'S REPEATED TESTIMONY ABOUT

33

DEFENDANT'S PRIOR BAD ACTS RESULTING IN PREJUDICE TO THE DEFENDANT AND TAINTING OF THE JURY.

POINT II

THE COURT'S INSTRUCTION TO THE JURY FOLLOWING THE OTHER CRIME EVIDENCE WAS NOT SUFFICIENTLY PROPER AND DID NOT CURE THE PREJUDICIAL EFFECT FROM THE MINDS OF THE JURY.

We begin our analysis by reaffirming that "'[a] trial judge has the ultimate responsibility to control [a] trial[.]'" State v. Cusumano, 369 N.J. Super. 305, 311 (App. Div.) (quoting Horn v. Vill. Supermarkets, Inc., 260 N.J. Super. 165, 175 (App. Div. 1992), certif. denied, 133 N.J. 435 (1993)), certif. denied, 181 N.J. 546 (2004). A trial judge is entrusted with the sound discretion to manage the conduct of a trial in a manner that facilitates the orderly presentation of competent evidence, whether in the form of physical exhibits or witness testimony made under oath, subject to the laws of perjury. The exercise of this authority is circumscribed by the judge's responsibility to act reasonably and within constitutional bounds. Ryslik v. Krass, 279 N.J. Super. 293, 297—98 (App. Div. 1995).

As we have long-recognized,

> The trial judge is the symbol of experience, wisdom and impartiality to the jury and, as such, must take great care that an expression of opinion on the evidence should not be given so as to mislead the jury. He must not throw his judicial weight on one side or the other.

34

[State v. Zwillman, 112 N.J. Super. 6, 20—21 (App. Div. 1970) (emphasis added), certif. denied, 57 N.J. 603 (1971).]

Here, the record shows the judge was not mindful of these admonitions. On a number of occasions, the judge attempted to control P.K.'s obstreperous behavior by reprimanding defense counsel in the jury's presence. The judge criticized defense counsel for asking questions that "opened the door" for P.K. to testify about areas or topics that the judge viewed as not germane to the August 31, 2013 incident. The judge also permitted P.K. to opine when the prosecutor objected to defense counsel's questions. The record shows these failures were not isolated incidents. The judge frequently did not: (1) address P.K. directly; (2) order her to stop talking when an attorney objected; or (3) instruct her to wait for the judge to rule on the objection before responding.

The judge's failure to exercise control first manifested itself during the afternoon session of the first day of P.K.'s testimony. When defense counsel cross-examined P.K. about a trip to Greece she took shortly after meeting defendant, P.K. gratuitously stated that defendant and another woman, identified here as N.M., "smoked crack together." When defense counsel objected, the judge discussed the matter with the attorneys at sidebar. However, instead of formulating an appropriate response

A-1653-14T1

with the input of counsel, the judge asked the prosecutor: "[D]id you not inform your victim she can't talk about any prior bad acts of the defendant?" When the prosecutor responded that she had spoken to P.K. about her testimony, the judge again shifted the burden to the prosecutor to remind the witness. The judge believed she was only responsible for giving a curative instruction to the jury.

The judge directed P.K. and the prosecutor to step outside the courtroom. The judge then instructed the jury to "disregard completely" P.K.'s testimony that defendant "was using crack cocaine with some other individual by the name of [N.M.]." P.K. and the prosecutor returned to the courtroom. Thereafter, P.K. took the witness stand and defense counsel resumed his cross-examination.

This event exemplifies the judge's misguided approach to courtroom management. Her role as the ultimate authority and presiding judge in the trial required that she directly address P.K. outside of the jury's presence. The judge should have sternly and clearly instructed the witness that she should respond to the questions without deliberately adding information prejudicial to defendant. The judge should have made equally clear that the witness was testifying under the court's direction and control. She was thus expected to answer all questions truthfully,

respectfully, and completely. If a witness does not understand a question, she should say so before attempting to respond. This will provide an attorney with the opportunity to rephrase the question, if possible.

We recognize that victims of a crime have a right under our Constitution to be "treated with fairness, compassion and respect by the criminal justice system." N.J. Const. art. I, ¶ 22. The Legislature also adopted the Crime Victim's Bill of Rights to ensure, inter alia, that a crime victim is "free from intimidation, harassment or abuse by any person[,] including the defendant or any other person acting in support of or on behalf of the defendant, due to the involvement of the victim or witness in the criminal justice process[.]" N.J.S.A. 52:4B-36(c).

However, when victims testify in a criminal trial, they are subject to the authority of the judge presiding over the proceedings and must follow the judge's instructions. If a witness is unwilling or unable to adhere to a trial judge's instructions or the witness's courtroom conduct becomes so obstreperous that it interferes with the orderly administration of the trial, the judge has the authority and responsibility to take reasonable measures to restore order, preserve the decorum and solemnity of the proceedings, and protect the defendant's right to a fair trial.

Here, the record shows P.K. repeatedly introduced extraneous and prejudicial information that was calculated to cast defendant as a dangerous individual. The judge characterized what happened in her courtroom as a "circus." The chaotic spectacle that occurred here arose from the witness's disruptive behavior, the defense attorney's inability to conduct an appropriate cross-examination, and the trial judge's misunderstanding of her role and responsibility to manage a contentious criminal trial.

As former trial judges, we are keenly aware of the challenge of maintaining order in a courtroom when confronted with a contentious witness. To assist our trial colleagues who may encounter similar circumstances, we suggest the following options. When faced with a recalcitrant witness, a judge should address the witness directly, but outside of the jury's presence. The judge should next identify the problem with particularity. Problems include: (1) not allowing the attorney to finish the question; (2) continuing to speak after an objection has been raised; (3) unresponsive answers; (4) providing extraneous, prejudicial information; and (5) arguing with the attorney asking the questions. Having identified the problem, the judge should clearly and concisely explain to the witness that the conduct disrupts the orderly presentation of the evidence to the jury and clashes with the decorum and solemnity of the proceedings.

A-1653-14T1

If the witness does not respond to this approach, but instead continues to disrupt the proceedings, as P.K. did here, the judge should confer with counsel and seek their input outside of the jury's presence. Before acting, the judge must determine whether the misconduct is willful, based on the judge's observations and interactions with the witness. If the judge finds the witness's misconduct is willful, the judge should state the basis for this finding on the record. Thereafter, the judge can consider if enjoining the witness from continuing to testify is a constitutionally viable alternative by balancing defendant's right to cross-examination and the State's right to present its case. We emphasize that these are just suggestions. The decision to grant a mistrial "'to prevent an obvious failure of justice'" always remains within the sound discretion of the trial judge. State v. Smith, 224 N.J. 36, 47 (2016) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)), cert. denied, 528 U.S. 1085, 120 S. Ct. 811, 145 L. Ed. 2d 683 (2000).

However, the trial court must exercise its discretion to declare a mistrial within the following analytical framework:

> To address a motion for a mistrial, trial courts must consider the unique circumstances of the case. State v. Allah, 170 N.J. 269, 280 (2002); State v. Loyal, 164 N.J. 418, 435—36 (2000). If there is "an appropriate alternative course of action," a mistrial is not a proper exercise of discretion. Allah, supra, 170 N.J. at 281. For example, a

39

curative instruction, a short adjournment or continuance, or some other remedy, may provide a viable alternative to a mistrial, depending on the facts of the case. See State v. Clark, 347 N.J. Super. 497, 509 (App. Div. 2002).

[Smith, supra, 224 N.J. at 47.]

Applying this standard of review, we conclude the trial judge abused her discretion in failing to declare a mistrial. The record shows a pattern of undeterred transgressions by the State's key fact witness. The trial judge counted eight individual instances in which this witness introduced irrelevant and highly prejudicial information about defendant. These were not isolated events. The witness was also highly combative with defense counsel. The judge failed to address the witness directly about her misconduct. Instead, she reprimanded defense counsel in the jury's presence for failing to ask a proper question. The trial judge's conduct severely prejudiced defendant. As Justice Long noted:

> [I]n presiding over a jury trial, the judge, who holds a powerful symbolic position vis-a-vis jurors, must maintain a mien of impartiality and must refrain from any action that would suggest that he favors one side over the other, or has a view regarding the credibility of a party or a witness.
>
> [State v. O'Brien, 200 N.J. 520, 523 (2009).]

Although the parties have repudiated the legal positions they advanced before the trial court, we decline to allow this incongruity to determine the outcome here. The integrity of our

criminal justice system and defendant's constitutional right to a fair trial drive our analysis. These principles lead us to one conclusion: What occurred in this trial cannot stand.

We make clear that the issue of double-jeopardy is not addressed by this decision. We nevertheless make the following brief comments. It is well-settled that "jeopardy attaches to a defendant when he [or she] is put on trial in a court of competent jurisdiction upon a valid indictment and a jury is impaneled and sworn to determine the issue of his guilt or innocence of the crime charged." Allah, supra, 170 N.J. at 280. But not every mistrial implicates the double jeopardy clauses of the Fifth Amendment of the United States Constitution, as applied to the states by the Fourteenth Amendment, Benton v. Maryland, 395 U.S. 784, 794, 89 S. Ct. 2056, 2062, 23 L. Ed. 2d 707, 716 (1969), or Article I, Paragraph 11 of the New Jersey Constitution.[7]

Here, the trial judge sua sponte dismissed with prejudice the first three counts in the indictment as a sanction against P.K.'s disruptive behavior. The judge did not have the authority to take this action. A judge presiding over a criminal jury trial cannot

---

[7] Although New Jersey's double-jeopardy clause has been described as "textually narrower in scope," State v. Dunns, 266 N.J. Super. 349, 362 (App. Div.), certif. denied, 134 N.J. 567 (1993), "the double-jeopardy protections provided in the State and federal constitutions are essentially coextensive in application." Ibid.; see also State v. Koedatich, 118 N.J. 513, 518 (1990).

enter a judgment of acquittal before the State has completed presenting its case and without applying the standards the Supreme Court established in <u>State v. Reyes</u>, 50 <u>N.J.</u> 454, 458—59 (1967); <u>see also</u> <u>R.</u> 3:18-1. "Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." <u>State v. Gallegan</u>, 117 <u>N.J.</u> 345, 358 (1989) (quoting <u>Oregon v. Kennedy</u>, 456 <u>U.S.</u> 667, 676, 102 <u>S. Ct.</u> 2083, 2089, 72 <u>L. Ed.</u> 2d 416, 425 (1982)).

There is no indication in the record that the judge considered the double-jeopardy implications of her decision. The parties have not briefed whether a decision declaring a mistrial would bar the State from trying defendant on the charges as originally reflected in the indictment. The State also did not seek timely appellate review of the judge's decision to dismiss with prejudice the first three counts in the indictment. We thus express no opinion on this issue.

IV

<u>Conclusion</u>

The jury's verdict finding defendant guilty of second degree possession of an assault firearm, <u>N.J.S.A.</u> 2C:39-5f, and fourth degree possession of a large capacity magazine, <u>N.J.S.A.</u> 2C:39-

42

3j, is vacated. The jury's verdict reached in the second phase of the bifurcated trial, finding defendant guilty of five counts of fourth degree possession of a handgun following a conviction for possessing a controlled dangerous substance, N.J.S.A. 2C:39-7a, is also vacated. The matter is remanded for retrial consistent with this opinion.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION