**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4875-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

WEEDJY J. MILIEN,
a/k/a MILIEN JASON,
and MILLIEN WEEDIV,

    Defendant-Appellant.

_____

Submitted December 8, 2021 – Decided February 25, 2022

Before Judges Hoffman, Whipple and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 17-10-3110.

Joseph E. Krakora, Public Defender, attorney for appellant (Douglas R. Helman, Assistant Deputy Public Defender, of counsel and on the brief).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Matthew E. Hanley, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant, Weedjy Milien, appeals from his trial convictions for second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b), and resisting arrest, N.J.S.A. 2C:29-2(a)(1). The jury acquitted defendant of multiple robbery charges. He contends the trial judge erred by denying his motion for a mistrial and by delivering inadequate curative jury instructions when a police witness, during cross-examination, improperly revealed that defendant was subject to an outstanding arrest warrant. Defendant also contends that his resisting-arrest conviction should be vacated because the pursuing officers did not verbally announce their intention to arrest him and did not have probable cause to make an arrest. Finally, defendant contends that the sentence imposed on his Graves Act[1] conviction for unlawful possession of a firearm is excessive. After carefully reviewing the record in light of the applicable legal principles, we reject defendant's contentions and affirm.

---

[1] The Graves Act is named for Senator Francis X. Graves, Jr., who sponsored legislation in the 1980s mandating imprisonment and parole ineligibility terms for persons who committed certain offenses while armed with a firearm. The term now refers to all gun crimes that carry a mandatory minimum term of imprisonment.

A-4875-18

# I.

We briefly summarize the facts that were adduced at trial. In doing so, we are mindful that defendant was acquitted of the robbery charges.

On the morning of July 4, 2017, Estebon Garcia-Tapia, Rodrigo Delores-Garcia, and Arisael Salano-Sierra were walking to work near Colgate Park in Orange. Two men approached them and one—alleged to be defendant—put a gun to Garcia-Tapia's head and demanded money. The assailants allegedly stole a gold chain that was around Garcia-Tapia's neck, his wallet, and his phone. The assailants also allegedly took the wallets and phones of Delores-Garcia and Salano-Sierra. The victims were ordered to start walking and not turn around. They complied with the robbers' command.

When he arrived at work, Garcia-Tapia advised his manager of the robbery. Garcia-Tapia, Delores-Garcia, and the manager got into a car to search for the robbers. Garcia-Tapia spotted the two men walking near Colgate Park. The manager called the police.[2] He provided the following description of the two men: (1) two black males, (2) both wearing white t-shirts, (3) the man with the gun had long blue pants on, (4) the other man was wearing khaki shorts. The

---

[2] The conversation with the 9-1-1 operator suggests that four men had robbed Garcia-Tapia, but only two were seen near Colgate Park.

A-4875-18

manager stayed on the phone until officers from the Orange Police Department arrived at the scene. The manager then advised the police dispatch that the individuals had begun to flee upon the officers' arrival.

Officer Karyn Tisdale-Dickson was on patrol near Colgate Park when she received a dispatch about an armed robbery and was provided a description of the robbers. She spotted two men who were wearing white t-shirts. She also noticed that one was wearing a black fanny pack.

Sergeant Tyrik Booker, a patrol officer at the time, was also dispatched to the area of Colgate Park. He saw two men walking and determined that at least one was wearing a white t-shirt.

As Booker and Tisdale-Dickson approached in their vehicles, the two men fled. Sergeant Booker chased one of the men, who was later identified as defendant. The chase proceeded through backyards and over several fences. Officer Tisdale-Dickson went to the front of the houses behind which the chase was occurring. She confronted defendant in an alleyway and arrested him. The officer noticed that he was no longer wearing the black fanny pack she had previously observed.

After Officer Tisdale-Dickson arrested defendant, Sergeant Booker retraced his steps from the pursuit and found the black fanny pack in one of the

4

backyards where the chase had occurred. Booker unzipped the fanny pack and found a silver handgun inside.

Defendant was subsequently brought to police headquarters. At or around that time, Garcia-Tapia was also in the stationhouse providing a statement to police. Garcia-Tapia identified defendant during a show-up procedure.[3] That same day, the police showed Delores-Garcia a photo array, but he was unable to identify defendant.

In July 2017, an Essex County grand jury returned an indictment charging defendant with six crimes: (1) second-degree conspiracy to commit a robbery, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1; (2) first-degree armed robbery of Estebon Garcia-Tapia, N.J.S.A. 2C:15-2; (3) first-degree armed robbery of Arisael Salano-Sierra, N.J.S.A. 2C:15-2; (4) first-degree armed robbery of Rodrigo Dolores-Garcia, N.J.S.A. 2C:15-2; (5) second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); and (6) second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a). A complaint-warrant also charged defendant with the disorderly persons offense of resisting arrest, N.J.S.A. 2C:29-2(a)(1).

---

[3] In State v. Henderson, the New Jersey Supreme Court explained that "[s]howups are essentially single-person lineups: a single suspect is presented to a witness to make an identification." 208 N.J. 208, 259 (2011).

In May 2019, defendant was tried before a jury. The Law Division judge presided over the jury trial. Sitting as a municipal court pursuant to Rule 3:15-3, the judge also served as the trier of fact of the disorderly persons resisting arrest charge. The jury found defendant guilty on count five, second-degree unlawful possession of a weapon, but acquitted defendant of all other indictable charges. The trial judge found defendant guilty of the resisting arrest offense.

The trial judge sentenced defendant on the handgun conviction to an eight-year prison term with a four-year period of parole ineligibility. The judge imposed a thirty-day term of incarceration on the resisting arrest conviction, to be served concurrently with the sentence imposed on the Graves Act conviction.

Defendant raises the following contentions for our consideration:

> POINT I
>
> TESTIMONY THAT MILIEN HAD AN OPEN WARRANT IRREDEEMABLY PREJUDICED HIS TRIAL, REQUIRING A MISTRIAL. IN THE ALTERNATIVE, THE HARM WAS NOT AMELIORATED BY THE WEAK CURATIVE INSTRUCTION OFFERED BY THE JUDGE. REVERSAL IS REQUIRED.
>
> A. THE OFFENDING STATEMENT.
>
> B. A MISTRIAL WAS REQUIRED.

C. IN ANY EVENT, THE CURATIVE INSTRUCTION FAILED TO REMEDY THE PREJUDICE OF DICKENS' COMMENT.

POINT II

MILIEN SHOULD HAVE BEEN FOUND NOT GUILTY OF THE DISORDERLY PERSONS OFFENSE OF RESISTING ARREST BY FLIGHT BECAUSE THE OFFICER DID NOT ANNOUNCE HER INTENTION TO ARREST BEFORE HE FLED.

POINT III

MILIEN'S SENTENCE IS MANIFESTLY EXCESSSIVE.

II.

We first address defendant's contention that the trial judge abused his discretion by denying defendant's motion for a mistrial and by delivering inadequate curative instructions. The following events took place at trial.

Orange Police Department Detective Lia Dickens testified that she had taken statements from the witnesses at the police station on the day of the alleged robberies. On cross-examination, defense counsel asked her about the procedures associated with show-up identifications. The following exchange between defense counsel and Detective Dickens ensued:

> Q — and if the person doesn't ID that person, they go on their way; right?

A    Correct.

Q    This suspect goes on their way?

A    Correct.

Q    Now in a case like this where a show-up was done at the police station, Weedjy Milien was already arrest [sic]; right?

A    He was detained.

Q    And when you say detained, and I don't mean to mince words here, he didn't come to the police department voluntarily; right?

A    He was detained just the same way someone would be detained on the street would be.

Q    Okay, but someone who is detained on the street is not removed from the location that they are currently; right?

A    Correct.

Q    They're not put in the back of a patrol car; right?

A    Correct.

Q    They're not driven to the police station.

A    Correct.

Q    And they're not put in a room at the police station; correct?

A    That is correct.   And those individuals aren't running either.

8

Q   Okay. So[,] in this case Weedjy Milien all those things happened to him; right? So[,] he was at the police station —

A   Yes, correct.

Q   — and if he had, you know, walked, tried to walk out of that room police officers would have stopped him; right?

A   Right.

Q   So Weedjy Milien he wasn't really free to go anywhere at that point.

A   Once the identification purposes were completed and he was not identified, yes, he would be able to leave.

Q   Okay. Before though, before the show-up was conducted in this case —

A   Right.

Q   — as you're waiting to do this show-up, he can't just walk out of the police station there —

A   Well to my knowledge he had an outstanding warrant, so I don't think he would be able to.

Defense counsel immediately objected to the reference to an outstanding warrant and moved for a mistrial, or in the alternative, a curative instruction. At the ensuing sidebar discussion, the trial judge denied the application for a mistrial, finding there was no "malicious intent" by the detective. The judge

9

determined that "an extremely strong curative instruction should be given to[] [t]he jury now" and then "carried over [i.e., repeated] in the [final] jury instruction." The judge proposed telling the jurors they were to "completely disregard that statement." Defense counsel objected, arguing "that [the jury] be instructed that there's been no evidence presented that there were any other warrants or the nature of any other warrants." The judge then proposed taking a recess to determine the wording of the curative instruction. The judge elected not to delay the remainder of the cross-examination because Detective Dickens had a prescheduled vacation starting the next day. Immediately following the sidebar discussion, the judge instructed the jury, "[t]he objection is sustained. You're to disregard that completely and you'll be given further instruction. That's an area that cannot be brought up in testimony."

At the charge conference, see R. 1:8-7(b), defense counsel proposed that the jury be told that Detective Dicken's comment was not evidence. Counsel also proposed that the jury be instructed that "Detective Dickens was mistaken in her belief, and there has been no evidence presented that Weedjy Milien had an outstanding warrant on July 4th, 2017." The State objected to that language because "defendant did have a warrant" and thus Detective Dickens was "not

mistaken." Defense counsel responded that unlike a 404(b)[4] curative instruction, where there are some limited purposes for which the jurors could use "other crimes" information, here there was no purpose for which the evidence of an outstanding warrant could be considered. Counsel argued, "the best way to help them truly put it out of their mind, is to put it out of their minds that that's even accurate information."

The trial judge ultimately instructed the jury that "Detective Lea Dickens testified that Weedjy Milien had a warrant on July 4th, 2017. Warrants may be issued for various reasons, including traffic violations and other quasi criminal matters. At that time, Weedjy Milien was not detained on a warrant."

We begin our analysis by acknowledging the governing legal principles. In State v. Smith, our Supreme Court explained the standard of review appellate courts must use when considering whether a trial court erred by failing to grant a mistrial. 224 N.J. 36 (2016). The Court stressed that trial courts should only grant a motion for a mistrial "to prevent an obvious failure of justice." Id. at 47 (quoting State v. Harvey, 151 N.J. 117, 205 (1997)).

The Court further explained that trial courts are obligated to "consider the unique circumstances of a case" when deciding a motion for a mistrial. Ibid.

---

[4] See N.J.R.E. 404(b).

Granting a motion for a mistrial is inappropriate when "an appropriate alternative course of action" is available. State v. Allah, 170 N.J. 269, 280 (2002). "For example, a curative instruction, a short adjournment or continuance, or some other remedy, may provide a viable alternative to a mistrial, depending on the facts of the case." Smith, 224 N.J. at 47.

Relatedly, juries are "deemed capable of following a curative instruction to ignore [a] prejudicial matter." State v. Ribalta, 277 N.J. Super. 277, 292 (App. Div. 1994) (citing Williams v. James, 113 N.J. 619, 632 (1989)). "[I]n administering the criminal law the courts must rely upon the jurors' ability and willingness to follow the limiting instruction without cavil or question." Ibid. (quoting State v. Manley, 54 N.J. 259, 270 (1969)).

In State v. Winter, our Supreme Court addressed "whether inadmissible evidence is of such a nature as to be susceptible of being cured by a cautionary or limiting instruction, or instead requires the more severe response of a mistrial." 96 N.J. 640, 646–47 (1984). The Court held that this determination "is one that is peculiarly within the competence of the trial judge, who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting." Id. at 647; see also State v. Yough, 208 N.J.

385, 397 (2011) (stating that whether a curative instruction can neutralize a prejudicial remark is within the trial court's competence).

"Whether an event at trial justifies a mistrial is a decision 'entrusted to the sound discretion of the trial court.'" Smith, 224 N.J. at 47. As a result, a reviewing court should not disturb a trial court's ruling absent a showing of an "abuse of discretion that results in a manifest injustice." Ibid. (quoting State v. Jackson, 211 N.J. 394, 407 (2012)). The same deferential standard that applies to the decision whether to grant a mistrial applies to an appellate court's review of a curative instruction delivered in lieu of granting a mistrial. Winter, 96 N.J. at 647.

In State v. Herbert, we recently outlined an analytical framework that trial courts should use when determining whether to give a curative instruction rather than granting a motion for a mistrial. 457 N.J. Super. 490, 505–07 (App. Div. 2019). We identified three relevant factors: (1) "the nature of the inadmissible evidence the jury heard, and its prejudicial effect"; (2) "an instruction's timing and substance"; and (3) "the risk of imperfect compliance." Ibid.

Applying the Herbert factors to the specific circumstances of the matter before us, we are satisfied that the two curative instructions that were delivered in this case were adequate to address the prejudice associated with the detective's

reference to an unspecified warrant. We thus conclude the trial court did not abuse its discretion either in denying defendant's motion for a mistrial or in fashioning and delivering the jury instructions to address the detective's wayward reference to inadmissible evidence.

With respect to the first factor—the "nature of the inadmissible evidence, and its prejudicial effect"—we stressed in Herbert that trial and reviewing courts should be mindful that "[t]he adequacy of a curative instruction necessarily focuses on the capacity of the offending evidence to lead to a verdict that could not otherwise be justly reached." Id. at 505 (citing Winter, 96 N.J. at 647). In this case, the detective's reference to an unrelated warrant, while clearly inadmissible, was in response to a cross-examination question whether defendant could "just walk out of the police station." The inappropriate testimony occurred only once and did not specify the type of warrant. Cf. State v. Cain, 224 N.J. 410, 433 (2016) (noting that "repeated statements that a judge issued a search warrant for a defendant's home—when the lawfulness of the search is not at issue—may lead the jury to draw a forbidden inference that the issuance of a warrant by a judge supports the rendering of a verdict"). Importantly, the detective's single reference to a warrant did not indicate the

reason for its issuance, which could have been for a serious crime, a traffic offense, failure to appear in court, or failure to pay a fine.

In Herbert, a detective violated the trial court's express prior ruling twice by alluding to the defendant's membership in a criminal street gang. 457 N.J. Super. at 499. In comparison, we conclude that the prejudice caused by the improper testimony in the present matter was less severe.

As to the second factor—relating to the "timing and substance" of a curative instruction—we noted in Herbert that "a swift and firm instruction is better than a delayed one." Id. at 505–06. There, we explained that "[d]elay may allow prejudicial evidence to become cemented into a storyline the jurors create in their minds during the course of trial." Ibid.; see also State v. Vallejo, 198 N.J. 122, 135 (2009) (stressing the importance of immediacy when trial judges provide curative instructions).

In the present matter, the court immediately instructed the jury to completely disregard the detective's reference to a warrant. The court also advised the jury that a further instruction would be provided, and then followed through by amplifying the initial curative instruction in the final jury charge. The court explained that warrants can be issued for a variety of reasons, including minor traffic violations.

We further recognized in Herbert that the substance of a curative instruction, in addition to its timing, will "affect [the] likelihood of [its] success." Id. at 505. Particularly, "[a] specific and explanatory instruction is often more effective than a general, conclusory one." Id. at 506. In Vallejo, the Court likewise "stressed the importance of [both] immediacy and specificity when trial judges provide curative instructions to alleviate potential prejudice to a defendant from inadmissible evidence that has seeped into a trial." 198 N.J. at 135. As we observed in Herbert, a conclusory curative instruction akin to telling the jury to disregard testimony "[b]ecause I said so" may be ineffective in correcting improper statements. 457 N.J. Super. at 506. Trial judges, therefore, should provide "enough specificity to enable the jury to follow the instruction." Id. at 507. "The instruction must be 'clear enough [and] sharp enough to achieve its goal.'" Ibid. (alteration in original) (citing Vallejo, 198 N.J. at 136–37).

In the present case, the judge did more than tell the jury to disregard the detective's reference. In the follow-up instruction, the judge provided an explanation for why the warrant was irrelevant. That explanation—that warrants can be issued for a variety of reasons, including minor traffic violations—was adequate to enable the jury to follow the instruction. We do not believe the

judge in these circumstances was required to mislead the jury by instructing them that Detective Dickens was "mistaken," as defendant requested.

As to the third factor in the Herbert analytical paradigm—"the risk of imperfect compliance"—we are satisfied that there is no basis upon which to assume that the jury did not follow the trial court's clear instructions. In Herbert, we explained,

> even in criminal cases involving errors of constitutional dimension, "not 'any' possibility [of an unjust result] can be enough for a rerun of the trial." "The possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." By contrast, a non-constitutional error "shall be disregarded by the appellate court 'unless it is of a nature as to have been clearly capable of producing an unjust result.'"
>
> [Id. at 507–08 (alteration in original) (citations omitted)].

We noted, however, that the guiding precedents do not "require[] an 'overwhelming probability' that the jury cannot comply, in order to conclude a curative instruction was inadequate." Id. at 508 (quoting Greer v. Miller, 483 U.S. 756, 766 n.8 (1987)).

Defendant's reliance on the particular result in Herbert, where we overturned the defendant's murder conviction, is misplaced. The circumstances that necessitated a reversal in Herbert are readily distinguishable from the

present matter. As we have already noted, in Herbert, the improper statements were significantly more prejudicial than Detective Dicken's reference to an outstanding warrant. Id. at 498. In Herbert, the trial court had issued an order making clear that any references to "gangs" during the trial were prohibited because the witness who would have testified that the murder arose from a gang conflict could not be secured to testify. Ibid. Despite that clear preemptive order, a detective testified on two occasions regarding gang involvement. We concluded the improper testimony, which suggested the murder occurred in a gang area and that Herbert was a gang member, "caused substantial prejudice" by suggesting to the jury that the homicide arose out of a gang conflict. Id. at 509, 512.

Furthermore, Herbert dealt with multiple improper statements that resulted in "the trial [coming] to an abrupt halt." Id. at 509; cf. State v. Bitzas, 451 N.J. Super. 51, 80 (App. Div. 2017) (noting that a mistrial was required because "[t]he record show[ed] a pattern of undeterred transgressions by the State's key fact witness . . . and [t]he trial judge counted eight individual instances in which this witness introduced irrelevant and highly prejudicial information about defendant").

Here, the trial briefly paused for a sidebar conference, after which the judge promptly instructed the jury to disregard the detective's reference to a warrant. Given the stark differences between the repeated infractions that occurred in Herbert involving the inherently prejudicial status of gang affiliation and the single transgression in the present matter regarding a reference to an unspecified warrant, we decline to assume that the jury in this case did not dutifully follow the court's instructions. See Ribalta, 277 N.J. Super. at 292. In sum, we are satisfied that the trial judge adequately rectified the prejudice to defendant by means of the combination of decisive and specific curative instructions.

## III.

Defendant argues that he did not commit the offense of resisting arrest because the officers never instructed him to stop and did not have probable cause to arrest. The trial judge, sitting as the trier of fact pursuant to Rule 3:15-3, found to the contrary, stating

> [i]t was a[] uniformed officer that chases [d]efendant throughout back yards. He clearly saw that it was a uniformed officer. He clearly fled that officer. He— there was probable cause, at least at that point, to . . . arrest him concerning the robbery of which he was found not guilty. Then of course, the handgun that was later recovered. So[,] I do find . . . the State has proven

19

beyond a reasonable doubt concerning the resisting arrest.

It is well settled that appellate courts owe deference to the factual findings made by trial courts. State v. Reece, 222 N.J. 154, 166 (2015) (citing State v. Locurto, 157 N.J. 463, 470–71 (1999)). Such findings will be upheld if the record contains sufficient credible evidence. Ibid. (citations omitted). Reviewing courts "should give deference to those findings of the trial judge which are substantially influenced by his [or her] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Locurto, 157 N.J. at 471.

In contrast to the deference appellate courts owe to a trial court's factual and credibility findings, legal conclusions are reviewed de novo. State v. S.S., 229 N.J. 360, 380 (2017). Accordingly, an appellate court is not required to defer to a trial court's finding of probable cause "when the facts and inferences do not support that conclusion." State v. Gibson, 218 N.J. 277, 294 (2014).

An individual commits the disorderly persons offense of resisting arrest when he or she "purposefully prevents or attempts to prevent a law enforcement officer from effecting an arrest." N.J.S.A. 2C:29-2(a)(1). The State bears the burden of proving "it was defendant's conscious object to prevent his [or her] arrest." State v. Ambroselli, 356 N.J. Super. 377, 385 (App. Div. 2003); see

also State v. Branch, 301 N.J. Super. 307, 321 (App. Div. 1997) (citing State v. Murphy, 185 N.J. Super. 72 (Law Div. 1982) (resisting arrest "requires a culpability of purpose"), rev'd in part on other grounds, 155 N.J. 317 (1998)). A defendant, therefore, must be aware that police are attempting to effectuate an arrest to be guilty of resisting it. Branch, 301 N.J. Super. at 321.

The law is also clear that if an arrest is lawful, a police officer's failure to announce that defendant is under arrest does not warrant an acquittal. Ibid. The failure to announce is merely "one factor to be considered in the overall sequence of events leading to the arrest." Ibid.

However, if the arrest is unlawful, the critical question becomes whether the officer announced his or her intent to arrest. N.J.S.A. 2C:29-2(a) expressly provides, "[i]t is not a defense to [resisting arrest] . . . that the law enforcement officer was acting unlawfully in making the arrest, provided he [or she] was acting under color of his [or her] official authority . . . and announces his [or her] intention to arrest prior to the resistance." Accordingly, if the arrest is unlawful, that is, not supported by probable cause, and the officer fails to announce his or her intention prior to the resistance, a conviction for resisting an unlawful arrest may not stand. See State v. Kane, 303 N.J. Super. 167, 182 (App. Div. 1997) (concluding that where the arrest was unlawful and the officers

21

failed to announce an intent to arrest, reversal of the resisting arrest conviction is required).

In the present matter, the record does not show that Officer Tisdale-Dickson or Sergeant Booker announced an intention to arrest defendant as he fled from them. Accordingly, we must determine whether the pursuing officers had probable cause to arrest. If not, defendant's conviction for resisting arrest must be reversed. Because probable cause is a legal determination, we review the record de novo. S.S., 229 N.J. at 380 (quoting State v. Morrison, 227 N.J. 295, 308 (2016)) (Because issues of law "do not implicate the fact-finding expertise of the trial courts, appellate courts construe the Constitution, statutes, and common law de novo—with fresh eyes—owing no deference to the interpretive conclusions of trial courts, unless persuaded by their reasoning." ).

In State v. Basil, our Supreme Court acknowledged that probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." 202 N.J. 570, 585 (2010) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)). Accordingly, probable cause "cannot be defined with scientific precision" because it is based on factual and practical considerations of reasonable individuals, not legal technicians. Id. at 585 (first citing State v. Evers, 175 N.J.

355, 381 (2003); and then quoting Gates, 462 U.S. at 231). Probable cause "is more than a mere suspicion of guilt" but "it is less than the evidence necessary to convict a defendant of a crime in a court of law." Ibid. (citing Brinegar v. United States, 338 U.S. 160, 175 (1949)). In State v. Moore, the Court explained, "[p]robable cause exists where the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been or is being committed." 181 N.J. 40, 46 (2004) (alterations in original) (quoting Schneider v. Simonini, 163 N.J. 336, 361 (2000)).

Furthermore, courts "must look to the totality of the circumstances and view those circumstances 'from the standpoint of an objectively reasonable police officer.'" Basil, 202 N.J. at 585 (citations omitted). The Supreme Court added:

> [i]n assessing the facts available to a police officer, important considerations are the witness's veracity, reliability, and basis of knowledge. Generally speaking, information imparted by a citizen directly to a police officer will receive greater weight than information received from an anonymous tipster. Thus, an objectively reasonable police officer may assume that an ordinary citizen reporting a crime, which the citizen purports to have observed, is providing reliable information.

[Id. at 585–86.]

Our de novo review of the totality of the circumstances from the viewpoint of an objectively reasonable police officer leads us to conclude that the officers in this case had probable cause to arrest defendant. Officer Tisdale-Dickson received descriptions of the suspected robbers that had been provided by robbery victims who were contemporaneously observing the suspects. The officers were also provided with the real time location of the robbers. That information, coupled with defendant's flight, provided an adequate basis to pursue and arrest defendant under the probable cause standard. We thus conclude the trial judge, sitting as the trier of fact, did not err in finding defendant guilty of resisting arrest.

## IV.

We turn next to defendant's contention that the trial court imposed an excessive sentence on the Graves Act conviction. Defendant argues that the trial judge erred by not considering defendant's youth, by improperly considering his arrest record, and by failing to adequately explain the reasons for the sentence. We note at the outset of our analysis that the eight-year prison term to which defendant was sentenced is only slightly above the mid-point of the five-to-ten-year range of ordinary terms for a second-degree crime. See N.J.S.A. 2C:43-

24

6(a)(2). Furthermore, the four-year period of parole ineligibility the trial judge imposed is only six months greater than the mandatory minimum 42-month parole ineligibility term prescribed by the Graves Act. N.J.S.A. 2C:43-6(c); see infra note 9. The sentencing court rejected the prosecutor's request to impose a five-year term of parole ineligibility.

The scope of our review is narrow. Sentencing decisions are reviewed under a highly deferential standard. See State v. Roth, 95 N.J. 334, 364–65 (1984) (holding that an appellate court may not overturn a sentence unless "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience"). Our review is limited to considering:

> (1) whether guidelines for sentencing established by the Legislature or by the courts were violated; (2) whether the aggravating and mitigating factors found by the sentencing court were based on competent credible evidence in the record; and (3) whether the sentence was nevertheless "clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Liepe, 239 N.J. 359, 371 (2019) (quoting State v. McGuire, 419 N.J. Super. 88, 158 (App. Div. 2011)).]

Furthermore, "[a] reviewing court may not substitute its own judgement for that of the sentencing court. Judges who exercise discretion and comply with

the principles of sentencing remain free from the fear of 'second guessing.'" State v. Megargel, 143 N.J. 484, 493–94 (1996); see also State v. Jarbath, 114 N.J. 394, 401 (1989) (holding the critical focus is whether the sentencing court was "clearly mistaken").  Reviewing courts must affirm a sentence if the trial court's evaluation of the aggravating and mitigating factors was based on competent credible evidence in the record.  Roth, 95 N.J. at 364–65.

The trial judge found aggravating factor three, N.J.S.A. 2C:44-1(a)(3) ("The risk that the defendant will commit another offense") and nine, N.J.S.A. 2C:44-1(a)(9) ("The need for deterring the defendant and others from violating the law.").  With respect to the statutory mitigating factors, the trial judge only found mitigating factor eleven, N.J.S.A. 2C:44-1(b)(11) ("Imprisonment of the defendant would entail excessive hardship to the defendant or the defendant's dependents.").  The judge considered but rejected defendant's request to find mitigating factors seven, N.J.S.A. 2C:44-1(b)(7) ("The defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offense."); eight, N.J.S.A. 2C:44-1(b)(8) ("The defendant's conduct was the result of circumstances unlikely to recur."); nine, N.J.S.A. 2C:44-1(b)(9) ("The character and attitude of the defendant indicate that the defendant is unlikely to commit

another offense."); and ten, N.J.S.A. 2C:44-1(b)(10) ("The defendant is particularly likely to respond affirmatively to probationary treatment.").

We first address defendant's contention that that the trial judge improperly considered his prior arrest record. That argument is belied by the record. Defendant cites to State v. K.S. for the proposition that "when no such undisputed facts exist or findings are made, prior dismissed charges may not be considered for any purpose." 220 N.J. 190, 199 (2015). However, as the defendant acknowledges in his appeal brief, the trial judge "did not specifically cite to any arrests that did not result in a conviction." The record thus shows the trial court did not accede to the prosecutor's request for the court to consider defendant's juvenile arrests. Rather, the trial judge considered defendant's four adult disorderly persons convictions and his juvenile delinquency adjudication for first-degree robbery/possession of a weapon for an unlawful purpose.

We next address defendant's contention that the trial court failed to consider defendant's youth. Defendant argues that a new statutory mitigating factor, codified in N.J.S.A. 2C:44-1(b)(14),[5] should be applied retroactively.

---

[5] N.J.S.A. 2C:44-1(b)(14) establishes a mitigating circumstance when "[t]he defendant was under 26 years of age at the time of the commission of the offense." This new mitigating factor was enacted by L. 2020, c. 110, and took effect on October 19, 2020—more than a year after defendant's sentencing

Defendant raises the retroactivity argument in a single sentence embedded in a footnote. In <u>Almong v. Israel Travel Advisory Serv., Inc.</u>, we noted that <u>Rule</u> 2:6-2(a)(5) [now <u>Rule</u> 2:6-2(a)(6)] requires a party's legal argument to be made under "appropriate point headings." 298 N.J. Super. 145, 155 (App. Div. 1997). We explained that "[r]aising legal issues on appeal [in a footnote] . . . [is] wholly improper" and "[a]ccordingly, we confine[d] our address of the issues to those arguments properly made under appropriate point headings." <u>Ibid.</u> In view of the paucity of legal argument in defendant's brief on this complex legal question, we decline to address whether the Legislature intended that N.J.S.A. 2C:44-1(b)(14) be applied retroactively. We note that this question is now pending before the Supreme Court, which granted certification in <u>State v. Lane</u>, No. A-17-21. In that case, the question before the Court will be, "[d]oes mitigating factor fourteen, N.J.S.A. 2C:44-1(b)(14), that the 'defendant was under 26 years of age at the time of the commission of the offense,' apply retroactively?"[6]

---

hearing. It is not disputed that that defendant was twenty years old when he committed the Graves Act offense on July 4, 2017.

[6] We add that our recent decision in <u>State v. Bellamy</u> does not apply in this case. 468 N.J. Super. 29 (App. Div. 2021). Although we suggested in <u>Bellamy</u> that the new mitigating factor is ameliorative, we made clear that "[t]his is not intended to mean cases in the pipeline in which a youthful defendant was sentenced before October 19, 2020, are automatically entitled to a

Although we decline to resolve the retroactivity of the new statutory mitigating factor, we next address defendant's contention that the trial court did not account for defendant's age in determining an appropriate sentence. Defense counsel submitted a sentencing memorandum on defendant's behalf, which the trial court acknowledged. The only reference to defendant's youth was a single sentence that reads in its entirety, "[t]he Court should also consider Mr. Milien's relative youth and 'the mitigating qualities of youth' when determining the appropriate sentence in this case. Cf. State v. Zuber, 227 N.J. 422, 429–30 (2017)."[7] At the sentencing hearing, counsel "rel[ied] primarily upon the written submission [she] provided to the Court" and did not amplify the concise argument in the sentencing memorandum regarding defendant's youth. In these circumstances, although the sentencing court did not explicitly consider

---

reconsideration based on the enactment of this statute alone. Rather, it means where, for a reason unrelated to the adoption of the statute, a youthful defendant is resentenced, he or she is entitled to argue the new statute applies." Id. at 48; see also State v. Rivera, __ N.J. __ (2021) (noting "the [trial] court on resentencing is free to consider defendant's youth at the time of the offense and apply mitigating factor fourteen, which was given immediate effect in all sentencing proceedings on or after October 19, 2020." Id. at __ (slip op. at 22) In the present matter, we are not remanding for re-sentencing.

[7] We note that Zuber addressed the constitutionality of a sixty-eight-year, three-month term of parole ineligibility imposed on a juvenile who was tried as an adult and convicted of felony-murder. 227 N.J. at 448.

defendant's youth as a mitigating circumstance, we find neither an abuse of discretion nor a reason to remand for the court to address the argument that defendant mentioned briefly in the sentencing memorandum. The judge was clearly aware of defendant's age and also his comparatively recent juvenile adjudication of delinquency for first-degree robbery and second-degree possession of a weapon for an unlawful purpose.[8]

Finally, defendant contends that the trial judge failed to explain the sentencing decision, and specifically, why he imposed a sentence above the mid-point of the second-degree range of ordinary terms and a parole ineligibility term above the 42-month minimum parole disqualifier prescribed by the Graves Act.[9]

---

[8] The record shows that defendant initially received probation for the robbery adjudication, but later violated probation and was placed in a residential juvenile facility for one year.

[9] We note that once the trial court decided to impose an eight-year state prison term, the four-year period of parole ineligibility was required by statute. N.J.S.A. 2C:43-6(c) provides in pertinent part that a person convicted of a handgun possession offense, N.J.S.A. 2C:39-5(b), "shall be sentenced to a term of imprisonment by the court. The term of imprisonment shall include the imposition of a minimum term. The minimum term shall be fixed at one-half of the sentence imposed by the court or 42 months, whichever is greater . . . ."

In <u>State v. Natale</u>, our Supreme Court eliminated the "presumptive term" that had been fixed at or near the mid-point of the sentencing range for each degree of crime.  184 N.J. 458, 488 (2005).  The Court explained,

> [a]lthough judges will continue to balance the aggravating and mitigating factors, they will no longer be <u>required</u> to do so from the fixed point of a statutory presumptive [term].  We suspect that many, if not most, judges will pick the middle of the sentencing range as a logical starting point for the balancing process and decide that if the aggravating and mitigating factors are in equipoise, the midpoint will be an appropriate sentence.  That would be one reasonable approach, but it is not compelled.  Although no inflexible rule applies, reason suggests that when the mitigating factors preponderate, sentences will tend toward the lower end of the range, and when the aggravating factors preponderate, sentences will tend toward the higher end of the range.
>
> [<u>Ibid.</u>]

In <u>State v. Kruse</u>, the Court explained that, "[t]o provide an intelligible record for review, the trial court should identify the aggravating and mitigating factors, describe the balance of those factors, and explain how it determined defendant's sentence."  105 N.J. 354, 360 (1987)).  We are satisfied that the trial judge identified and balanced the applicable aggravating and mitigating factors and provided an intelligible record for our review.  The sentence imposed in this case—which is above the mid-point of the second-degree sentencing range but

A-4875-18

well below the upper limit of that range—does not "shock the judicial conscious," see Roth, 95 N.J. at 364–65, and affords no basis for our intervention.[10]

To the extent we have not specifically addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[10] As we previously noted, the Supreme Court has a pending case that will decide whether and in what circumstances the new statutory mitigating factor applies retroactively and what relief, if any, is to be afforded to persons who were under the age of twenty-six at the time of their offense and who were sentenced before N.J.S.A. 2C:44-1(b)(14) took effect.

A-4875-18